IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID PARDUE                                                           PLAINTIFF

              v.                   Civil No. 05-5004

SGT. GLASS; DEPUTY ROBERT TAYLOR;
DEPUTY CRAIN; SHERIFF STEVE WHITMILL;
and JOHN DOES Deputies at Washington County
Jail                                                            DEFENDANTS

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

David Pardue, who is presently detained in the Arkansas Department of Correction, brings this pro se civil rights action under 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was detained in the Washington County Detention Center. Pardue is proceeding in forma pauperis.

The defendants filed a motion for summary judgment on October 28, 2005. (Docs. 22-24.) On December 15, 2005, plaintiff filed a response to their motion. (Docs. 36-37.) The motion for summary judgment is presently before the undersigned for issuance of this report and recommendation.

### **I. Background**

In his complaint (Doc. 1), Pardue alleges that he was subjected to torturous treatment while detained in the Washington County Detention Center (WCDC). Specifically, Pardue alleges that on August 2, 2002, at approximately 6:30 p.m., he was being booked into the WCDC. A Ms. D. Smith, who has not been named as a defendant, asked Pardue where he was

born. When Pardue responded that he did not remember, Sgt. Glass[1], who was nearby but on the other side of a plexiglass window, stated that she had never heard anyone respond that way. Pardue remarked to Smith that someone was "trying to break into [their] conversation." Glass then threw a set of keys at Pardue, but due to the window being between Pardue and Glass, the keys hit the window. Pardue then remarked to Smith "that people were getting violent." Glass then threatened to place Pardue in "the chair" and perform a "sternum rub" on him to see if he would talk. Pardue told Glass that he was exercising his Fifth Amendment right to remain silent. Glass had a restraint chair brought into the room with Pardue, where she ordered him to sit in it and order others to place the restraining straps on Pardue. (Doc. 1.)

After he was placed in the chair, Pardue was pushed down the hallway to a location where he could not be observed. Glass then told Pardue that he would answer her questions or she was perform a sternum rub on him, which would be very painful. Officer Robert Taylor was present at this time and told Pardue that when he performs a sternum rub, Pardue would answer because Taylor could make it very painful. (Doc. 1.)

After issuing their threats, Pardue informed Glass that he was invoking his right to remain silent. Glass then placed her knuckles into Pardue's chest and began the sternum rub. Pardue claims that this caused him "a lot of pain." After an unspecified amount of time, Glass stopped the sternum rub and Taylor began, stating he bet he could "make it hurt." Taylor performed the sternum rub "for about ten minutes." Taylor told Glass that he could tell it was hurting Pardue because Pardue was tightening his hands and gritting his teeth. When Taylor stopped, he joked

---

[1] According to defendant's answer (Doc. 9), Sgt. Glass is now "Sgt. Augustine." For the sake of clarification, the court will refer to her as Sgt. Glass in this Report and Recommendation.

to Glass that about possibly cracking Pardue's sternum and remarked that Pardue was tough because Taylor could not make him talk. (Doc. 1.)

Pardue remained strapped in the chair and was moved around the jail facility. He alleges that Glass and Taylor would purposefully drop the chair, push the chair into doorways, and placed the chair in a position where the control room door would strike the chair when others entered or exited the control room. Pardue contends this was done to cause him pain from his head being jerked around and to prevent him from resting or sleeping. Glass then asked if Pardue was ready to answer her questions, and Pardue responded with a request to see a doctor for his chest pain. At the time, Pardue had his eyes closed due to pain, and Glass ordered him to open his eyes while talking to her. Pardue refused to do so. (Doc. 1.)

While Pardue and Glass were talking, Taylor and an unidentified officer entered the room and took Pardue to the nurse's station, where a nurse took Pardue's blood pressure and checked his blood sugar levels. Officer Selvey was present at the nurse's station, and he "took some white clear substance which looked and smelled like alcohol, put it on a rag, and began to rub it back and forth" across Pardue's chest. Pardue states that this was very painful, and that with the last "swab across [his] skin," Selvey grabbed Pardue's chest hairs and pulled them out. (Doc. 1.)

After finishing with the nurse's station, Pardue was returned to the control room. There, Sgt. Glass ordered Officer Crain to take Pardue to the yard. Pardue was allowed to be in the yard, and after five minutes, he sat down. When he did so, they told him it was time to go back inside. When Pardue told Crain that he need help getting up, Crain jerked Pardue's arm in a forceful manner, causing pain. Pardue complained, and Crain then jerked his arm even harder, and rammed Pardue's head and shoulder into a door to open the door. Crain placed Pardue back

AO72A
(Rev. 8/82)

into the restraint chair and placed the restrains on Pardue so tightly that it caused the circulation to be cut off from Pardue's hands. Pardue asked that they loosen the straps, but the officers refused. Pardue was again placed next to the control room door. (Doc. 1.)

Some time later, Sgt. Glass again told Pardue that if he would answer her questions, she would take Pardue out of the restraint chair and not perform any sternum rubs. Pardue requested to see a doctor and a judge immediately. Sgt. Glass asked Pardue to specify where he was hurting, and he responded that he was hurting in his chest where Glass and Taylor had performed sternum rubs. Sgt. Glass told Pardue that he was faking his injury and that the federal marshals had told her that Pardue was an escape risk. At the time of this conversation, and Officer Loyns was present. (Doc. 1.)

Officer Loyns and another officer took Pardue back to the nurse's station where they checked Pardue's blood pressure. These officers told Pardue that they did not want to talk about his chest pain and refused to write down his complaint. Pardue was again strapped into the chair and returned to the control room. At 6:00 a.m., Sgt. Glass was preparing to go off of duty, and she again asked Pardue if he would cooperate by answering her questions. Pardue responded by demanding to be taken in front of a judge. Glass and Loyns refused this request. (Doc. 1.)

At 6:00 a.m., Officer Nancy Luther asked Pardue if he was ready to get out of the restraint chair. Pardue responded that he was not going to answer questions to be released from the chair, that he was exercising his right to remain silent, and that he wanted to be taken before a judge immediately. Luther denied this request. Pardue then stated that he needed medical care for his chest. An Officer Winkle was present during this conversation. Although Luther responded that she was not going to obtain medical care for Pardue, a nurse did arrive sometime

-4-

later. The nurse told Pardue that she was not going to talk about the wound on Pardue's chest. The nurse also refused to examine the wound, so Pardue had to describe it to her. He described the size of the wound and informed the nurse that it was bleeding. After repeated requests, the nurse agreed to write down Pardue's complaints about the pain and wound on his chest. Also at Pardue's request, Officer Winkle took a picture of the wound. (Doc. 1.)

Several days later, Pardue submitted several medical requests concerning his chest wound. None of forms were answered by the nurses. On August 12, 2002, a nurse saw Pardue. She told him that she had not received a medical request from him. Pardue told her that he had personally seen an Officer Bowen hand Nurse Rhonda Pardue's requests on six separate occasions. (Doc. 1.)

Pardue contends that he is aware of several other occasions when Sgt. Glass has used the restraint chair as a form of punishment. Pardue claims that the practice of torture is wide spread and widely known. Additionally, Pardue claims that he saw Sheriff Whitmill enter the jail while the abuse was occurring and did not order the officers to stop. Although the WCDC has a grievance procedure, Pardue did not file a grievance because Glass threatened him and he was afraid that he would be subjected to further torture. (Doc. 1.)

Pardue clearly states that he is suing Glass, Taylor, and Whitmill in their official and personal capacities. (Doc. 1 at 13-14.)

After utilizing the discovery process, Pardue filed two identical documents entitled "Affidavit in Support of Complaint." (Docs. 29, 35.) In these documents, plaintiff somewhat alters his allegations. Some of these alterations include: (1) that in addition to Glass and Taylor, Officer Selvey also was present and performed a sternum rub on Pardue for two to three minutes,

(2) that Officer Taylor used a metal object, such as a ring, to perform the sternum rub, (3) that Officer Taylor began questioning Pardue about his criminal charges, (4) that Pardue was denied food and the ability to use the restroom for the entire night, (5) that a nurse was not present when Pardue was first taken to the nurse's station, and (6) that Pardue saw a Nurse Laura Rico the morning after he was released from the restraining chair, and she has personal knowledge of his injuries. (Docs. 29, 35.)

In their Statement of Indisputable Material Facts, defendants contend that Pardue's intake was completed by Officer Taylor and witnessed by Sgt. Luther on August 2, 2002. At that time, a hand-written notation was made which stated, "Never deal with this man alone per U.S. Marshals" and that Pardue was an escape risk. (Doc. 23 at ¶ 6.) Taylor reported that around 7:30 p.m., he and Deputy Selvey placed Pardue in a booking booth #2. Deputy Smith reported minutes later that Pardue would not answer questions. When Deputy Curtsinger tried to ask Pardue questions, Pardue told Curtsinger to mind her own business. (Doc. 23 at ¶ 7.) Sgt. Glass then tried to ask Pardue questions, and Pardue told her that she and Smith were being childish. Deputy Selvey then asked Deputy Taylor to assist placing Pardue in the restraining chair for being hostile to the matrons. (Doc. 23 at ¶ 8.) Defendants contend that Pardue was placed in the chair for fear that he might attempt to harm a deputy. After being placed in the chair, Taylor read the warrants to Pardue. (Doc. 23 at ¶ 9.) Due to Pardue's hostility and non-compliance, jail officials placed Pardue on 15 minute checks and placed him in the hall outside of the control room. (Doc. 23 at ¶ 10.) Defendants provide a log of the 15-minute jail checks for Pardue. (Doc. 23 at Ex. 2.) Five minutes after Pardue was placed in the hall, Sgt. Glass called on the radio to report that Pardue appeared to be having a seizure and requested that Taylor and Selvey

AO72A
(Rev. 8/82)

check Pardue. (Doc. 23 at ¶ 11.) Taylor called the Pardue and slapped Pardue's arms but did not receive a response. Selvey then attempted a sternum rub on Pardue and then Taylor attempted a sternum rub. When Taylor performed the sternum rub, he noticed Pardue clinching his fists and grunting. He asked Pardue if he was okay, but Pardue acted as though he were still "out." (Doc. 23 at ¶¶ 12-13.) Taylor then went to the medical office and retrieved an ammonia inhalant. When he administered the inhalant to Pardue, Pardue responded. (Doc. 23 at ¶ 14.) Taylor reported the events to Sgt. Glass(Doc. 23 at ¶¶ 15.) Sgt. Glass ordered that Pardue's vitals be checked. His blood pressure was 140 over 80 and his pulse was 62. He asked to see a doctor and the U.S. Marshal, but would not state why he needed to see the Marshal or answer the booking questions. Pardue was again place in the restraint chair and located outside of the control booth. (Doc. 23 at ¶ 17.) Officer Taylor later completed a Use of Force Report, stating that Pardue had been placed in the restraint chair and no injury was observed. Taylor noted in this report that Pardue had refused to answer booking questions and was acting hostile towards the jail matrons. (Doc. 23 at ¶ 18.)

According to the defendants' exhibits, plaintiff was seen by Nurse Laura Rico the following morning at 11:27 a.m. In her narrative, Nurse Rico states:

> Inmate answered all medical questions. Complained of being tortured because he refused to answer any questions last night when he was being booked. Claimed an officer had thrown keys at him in the restraint chair. Claimed he never lost conscience [sic], that they rubbed his chest so hard that it was bleeding, then someone had rubbed alcohol on the wound. On examination, the chest area has abrasion with redness and drainage. Complains of discomfort, medicated with ibuprofen with relief. Inmate very upset and had not slept at all. Medicated with .5 mg Alprazolam. Inmate resting quietly at present, in booking booth.

(Doc. 23 at Ex. 1.)

AO72A
(Rev. 8/82)

According to defendants, Pardue made written requests to see a doctor and have his chest examined on August 9, 10, and 11, and was examined by Nurse Rhonda Bradley on August 12. Nurse Bradley prescribed Excedrine Migraine 2 tabs daily for 10 days, cleaned an 8 cm x 2.5 cm abrasion on Pardue's chest, applied topical antibiotic ointment, and noted no signs of infection. Pardue again requested to see a doctor on August 12 and 13. On August 13, Nurse Bradley saw Pardue and placed him on the MD list. Dr. Howard examined Pardue on August 14, noted "mild abrasions on chest do not appear serious; continue neosporin ointment" and prescribed ibuprofen. (Doc. 23 at ¶¶ 24-31.)

WCDC maintains a written policy concerning the use of force and the use of a restraint chair. The restraint chair policy states, "The Restraint Chair is to be used in situations where a detainee is violent, resisting officers physically, suicidal, banging doors continually to the point where it disrupts the operation of the facility, or the detainee is a threat to himself, the other detainees, the officers, or the safe operation of the facility." (Doc. 23 at Ex. 4.)

In his response to defendants' presentation of the facts, Pardue states (1) that his refusal to answer questions was not acting with hostility, (2) that he was placed in the restraint chair in retaliation for his failure to answer all of the questions, (3) that Sgt. Glass was present when Officers Selvey and Taylor performed the sternum rubs and was the person who ordered them to do so, (4) that he was only allowed out of the restraint chair for five minutes in the yard, (5) that Nurse Rico's narrative and Dr. Howard's statement discredit Officer Taylor's report that Pardue did not suffer an injury, (7) that he did not violate any WCDC rule that justified placing him in the restraint chair, and (8) that jail officials did not try any other action in an attempt to obtain Pardue's cooperation before placing him in the restraint chair. (Doc. 37.)

AO72A
(Rev. 8/82)

For summary judgment, defendants argue that (1) plaintiff brings his claims against the defendants in their official capacities only, (2) plaintiff's only claim against Sheriff Whitmill is under the doctrine of respondeat superior, (3) plaintiff was not subjected to cruel or unusual punishment for being placed in a restraining chair because Pardue had been non-compliant and hostile toward WCDC officials who were trying to complete paperwork and the sternum rub was used to determine if plaintiff was conscious during what appeared to be a seizure, (4) defendants are entitled to qualified immunity, and (5) failure to perform a sternum rub correctly constitutes negligence. (Doc. 24.)

Pardue responds that he named defendants in both their official and individual capacities, there was a history of similar treatment to other detainees of the WCDC, Sheriff Whitmill was aware of others receiving torturous treatment, he was subjected to cruel and unusual punishment, and defendants' actions were intentional and not negligent. (Doc. 36.)

## II. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical

AO72A
(Rev. 8/82)

doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d 607 *(citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. Discussion

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. "To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must show [1] a deprivation [under color of law] of [2] a right, privilege, or immunity secured by the Constitution or the laws of the United States." *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). "[T]o establish a violation of constitutional rights under § 1983, the plaintiff must prove that the defendant's unconstitutional action was the 'cause in fact' of the plaintiff's injury." *Butler v. Dowd*, 979 F.2d 661, 669 (8th Cir. 1992).

**Official Capacity Claims**

Defendants argue that plaintiff names them in their official capacities only. Plaintiff responds that he intended, and did, name defendants in both their official and individual capacities.

Under section 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the

*Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.

*Gorman*, 152 F.3d at 914 (citations omitted).

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989); *see also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999) (in actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995) ("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

-11-

It is clear from plaintiff's complaint that he named the defendants in both their official and individual capacities. Plaintiff states this clearly on pages 13-15 of his complaint. (Doc. 1.) Therefore, the court must consider the claims against defendants in both capacities.

A governmental entity may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional custom or policy. *See Doe v. Washington Co.*, 150 F.3d 920, 922 (8th Cir. 1998).

Thus, Washington County would be held liable for defendants' conduct only if it had a policy or custom that caused plaintiff's injury. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). In the absence of a written policy, plaintiff must identify a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law. *See Jane Doe A v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 646 (8th Cir. 1990). Plaintiff must show that Washington County "through its deliberate conduct . . . was the 'moving force' behind the injury alleged." *Brown*, 117 S. Ct. at 1388.

"[I]naction or laxness can constitute government custom if it is permanent and well settled." *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 807 (8th Cir. 1994) (citation omitted). "Such a government custom of laxness or inaction must be the moving force behind the constitutional violation." *Id.*

The plaintiff claims that placing of detainees in the restraint chair was a regular and common practice at the WCDC. He also claims that he personally witnessed Sheriff Whitmill enter the jail and observe this practice without correction Therefore, plaintiff has presented a question of whether the custom of allowing jailers to use the restraint chair as a common tool to

-12-

punish detainees led to the incident alleged by the plaintiff. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (single incident normally does not suffice to prove existence of custom). Defendants motion for summary judgment on the grounds of official capacity should be denied.

**Individual Capacity Claims**

A question of material fact remains on plaintiff's individual capacity claims against defendants. Excessive force claims brought by a pretrial detainee, although grounded in the Fifth and Fourteenth Amendments, are analyzed under an objective reasonableness standard. *See Graham v. Conner*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Due process requires that a pretrial detainee not be punished. *See Bell v. Wolfish*, 441 U.S. 520, 537 n.16, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (due process requires that a pretrial detainee not be punished; the Eighth Amendment requires that the punishment imposed not be cruel and unusual). Thus, excessive force claims are analyzed under the reasonable objectiveness standard instead of the standard used in Eighth Amendment cases.

The injuries received by a pretrial detainee "must be necessarily incident to administrative interests in safety, security, and efficiency. Constitutionally inform practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose, or those that are rationally related but are excessive in light of their purpose." *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989) (*citing Bell*, 441 U.S. at 539 n.20.)

A stark contrast exists between the plaintiff's and defendants' versions of what happened on August 2, 2002. Further, evidence presented by the defendants--such as Nurse Rico's narrative that the morning after the alleged sternum rub plaintiff had a chest abrasion that was

AO72A
(Rev. 8/82)

red and had drainage, and Dr. Howard's notes that an abrasion was still visible 12 days after the alleged incident--certainly present a genuine issue as to whether the sternum rub was done to check plaintiff for consciousness or as a means of torture or punishment. Also, defendants have yet to present any facts to support their contention that plaintiff was acting in a hostile manner that would justify placing him in a restraining chair outside of the booking room. Thus, the court cannot, at this stage of the proceeding, say that plaintiff was not subjected to cruel or unusual punishment.

Furthermore, in light of plaintiff's allegation that Sheriff Whitmill did observe such treatment on other detainees and failed to respond, plaintiff's claims against Sheriff Whitmill should continue. *See Boyd v. Knox*, 47 F.3d 966, 968-69 (8th Cir. 1995) (supervisor is liable where he is personally involved in violation, i.e., where he knows about conduct and facilitates it, condones it, or turns blind eye).

Finally, defendants cannot maintain a defense of qualified immunity. A reasonable detention center officer would have known in August 2002 that the alleged behavior--strapping a detainee in a chair and performing a sternum rub for more than 10 minutes--would violate that detainee's constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (if law was clearly established, immunity defense ordinarily should fail, since reasonably competent public official should know law governing his conduct).

## IV. Conclusion

Therefore, I recommend that defendants' motion for summary judgment (Doc. 22) be denied.

**The parties have ten days from receipt of this report and recommendation in which**

AO72A
(Rev. 8/82)

**to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 5th day of September 2006.

                                                     **/s/ Beverly Stites Jones**
                                                     _____
                                                     HON. BEVERLY STITES JONES
                                                     UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)